**Pamela SCHNEIDER et al., Plaintiffs,**

v.

**Betti S. WHALEY, Individually and as Commissioner of the Agency for Child Development of the City of New York, et al., Defendants.**

No. 76 Civ. 2715.

United States District Court, S. D. New York.

June 30, 1976.

Litman, Friedman & Kaufman by Jack T. Litman, Lewis Friedman, Pollack & Kaminsky by Richard M. Asche, Martin I. Kaminsky, New York City, for plaintiffs.

W. Bernard Richland, Corp. Counsel, by W. Bernard Richland, Rosemary Carroll, Joseph F. Bruno, New York City, for defendants.

## MEMORANDUM DECISION AND ORDER

CANNELLA, District Judge:

Named plaintiffs, parents whose children attend day care centers funded under Title XX of the Social Security Act (42 U.S.C. § 1397 *et seq.*) suing on behalf of themselves and all others similarly situated, seek a preliminary injunction staying the Agency for Child Development ("ACD") and the other defendants from totally defunding forty-nine (49) day care centers and partially defunding fifteen (15) others prior to affording plaintiffs some form of a hearing. The preliminary injunction is granted.

On July 1, 1976, the ACD, a division of the Human Resources Administration created by mayoral order to administer New York City's day care services, will totally defund forty-nine day care programs and partially defund fifteen more. These defundings, which were publicly announced on May 26, 1976, will result in the closing of centers which now provide services for more than 3,000 children.

The day care centers are authorized and operated pursuant to New York Social Services Law § 410 *et seq.* By enacting § 410–b of the Social Services Law, New York State has exercised its option to participate in the federal program providing funds to electing states. The defundings are the direct result of a cut in ACD's 1976–77 Budget from the 157 million dollars allocated for (fiscal year) 1975–76 to 126.2 million "or a 16% deficit between present

cost and available funds." Tamke Affidavit in Opposition, at 2. Reacting to this financial constraint, ACD determined that it was necessary to defund a number of day care centers and undertook a cost-utilization and facility adequacy study in order to determine which centers should be defunded. On the basis of these inquiries and meetings between ACD staff members and the sponsoring boards of a number of the centers selected to be defunded, the decision to defund the programs in which plaintiffs' children are enrolled was made.

Notice of the closings was sent to each affected center on or about June 1, 1976 and meetings were held between the ACD staff and the sponsoring boards of the defunded programs "for the express purpose of explaining the reasons for defunding and the implementation of criteria used in making such determination." Tamke Affidavit, at 3. The record is unclear regarding how many parents have received individual notice that their center is to be closed; however, a survey conducted at plaintiffs' behest by the Leadership Committee of the Day Care Legal Action Coalition revealed that as of the middle of June only 28% of the children attending centers which will close had been offered alternative services. On the other hand, a review of the exhibits submitted by ACD on the evening of June 28th indicates that at present well over 50% of the parents have been notified of the defunding and offered alternative services.

The Leadership Committee survey also disclosed that 1,000 parents had made written demands for a fair hearing pursuant to 18 N.Y.C.R.R. § 358.2 et seq., but that none had been granted. Finally, the survey results indicated that the alternative services which were offered to those 28% who had been contacted were considered inadequate by those parents. The primary complaint voiced was that the alternative center was not within walking distance as the defunded center had been, and required one or two buses to reach.

ACD projects that by June 30, 1976, 72% of the affected children will have been placed in alternative centers, and that by August 31, 1976 all remaining children will be placed. In addition, ACD has pledged that in making the new placements it will "accord geographic considerations the highest priority. . . ." (Tamke Affidavit, at 7), and estimates that between 75% and 85% of the children affected will be offered placement in centers within 15 to 20 blocks of their present center. Nathaniel Affidavit, at 1.

■ Upon the above facts the plaintiffs move for preliminary relief enjoining the defendants from defunding their centers prior to affording them a hearing. They urge that such a hearing is required by the terms of 45 C.F.R. §§ 205.10 and 228.14 as well as the due process clause of the fourteenth amendment. In order to prevail upon a motion for a preliminary injunction, a party "must either demonstrate a combination of probable success on the merits and the possibility of irreparable injury or, in the alternative, that he has raised serious questions going to the merits and that the balance of hardships tips 'decidedly' in his favor." *Brown & Williamson Tobacco Corp. v. Engman,* 527 F.2d 1115, 1121 (2d Cir. 1975).

■ Before proceeding to a consideration of the merits of plaintiffs' claim, the Court grants their motion to denominate this action a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure. The class, which shall consist of all parents of children who attend the centers scheduled to be defunded on July 1, 1976, is so numerous that joinder of the more than 3,000 class members would be impracticable. In addition, the question of whether a hearing is required is common to all members of the class and the named plaintiffs' claims are typical. The Court finds that the named plaintiffs and their attorneys will adequately represent the interests of the class. Finally, this case is appropriate for treatment as a 23(b)(2) class action in that the defendants have "acted or refused to act on grounds generally applicable to the class . . ." making final class wide injunctive relief appropriate.

## THE MERITS

### A. *The Claim*

Plaintiffs premise jurisdiction in this action on 28 U.S.C. § 1343(3) and (4), 28 U.S.C. § 1331 and the doctrine of pendent jurisdiction. While the plaintiffs do not dispute that ACD, the City and the State are all in a "financial crunch" and that ACD's limited funding requires a redistribution of funds at the very least, they claim that by defunding the centers without providing the affected parents a prior hearing and/or public notice period the defendants are acting in violation of the due process clause of the fourteenth amendment as well as in violation of the applicable federal (45 C.F.R. §§ 205.10, 228.14) and state regulations (18 N.Y.C.R.R. § 358). Specifically, the plaintiffs request that prior to a final decision regarding defunding there be a "single [group] hearing at which evidence common to all defunded centers will be presented" or "several simultaneous hearings . . . each dealing with parents from a specific center or group of centers." Plaintiffs' Views re: Fair Hearing, at 1–2.

### B. *The Law*

■ In *Hagans v. Lavine,* 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974), the Supreme Court held that where a complaint contains both a federal question claim that a state or local practice is violative of a constitutional provision, and a pendent claim that a state practice is inconsistent with a federal statute or administrative regulation, the district court should make a threshold determination as to whether the constitutional challenge is substantial so as to vest the court with a jurisdictional predicate from which consideration of the pendent claim can proceed. Under *Hagans,* if the pendent or statutory claim is "dispositive" the court is to proceed to consider it and thus avoid a constitutional decision. *Id.* at 543 and 547 n. 12. In the instant case, however, the Court concludes that none of the pendent claims urged by the plaintiffs is dispositive and the Court must, perforce, reach the constitutional issue.

Analysis of the regulations contained in 45 C.F.R. § 205.10 *et seq.,* indicates that under the facts of this case few of the class members would be entitled to a procedure whereby they could effectively make their positions known prior to the scheduled closings. Even if the Court accepts the view expressed by the H.E.W. Associate Regional Commission for Public Services that an offer of alternative services at a distant center is a reduction in services which triggers the right to a hearing, 45 C.F.R. § 205.-10(a)(6)(A) provides that if a determination is made at the hearing that the "sole issue is one of State or Federal law or policy . . . and not one of incorrect grant computation" assistance can be reduced before a decision is rendered. The Court concludes that the question of how to meet the current budget crisis is one of policy, albeit policy which cannot be made without access to facts (see discussion *infra* ). As such it comes within the meaning of § 205.-10(a)(6)(A) and mandating compliance with the federal regulations will not be dispositive of the plaintiffs' claim for relief. The Court therefore proceeds to a consideration of plaintiffs' constitutional claim.

## THE CONSTITUTIONAL QUESTION

The constitutional question raised by this case is whether the parents who utilize the day care centers scheduled to be closed on July 1, 1976 have a due process right to some sort of hearing or opportunity to present evidence and argument, prior to the closings.

Analysis begins with an examination of the nature of the interest which the plaintiffs have in sending their children to day care centers. Pursuant to 42 U.S.C. § 1397a, Congress has provided federal funds to pay for 75% of a state's total expenditures (up to a maximum for New York of approximately 150 million) in providing child care services for the purpose of "achieving or maintaining economic self-support to prevent, reduce or eliminate dependency." 42 U.S.C. § 1397a(a)(1)(A). New York State has chosen to participate in this program and pursuant to Social Services Law § 410–b, the state department

of taxation and finance is authorized to accept and receive funds from the federal government for the "construction, maintenance or operation of facilities for day care for children, under or pursuant to any federal law heretofore or hereafter enacted . . . ." Section 410 permits cities to provide day care at public expense for eligible children and to "purchase" such care from private non-profit corporations. Pursuant to New York City Executive Order No. 38, July 1, 1971, the Agency for Child Development, a division of the Human Resources Administration of the City of New York, was created to oversee the City's participation in the provision of day care services. To date, ACD has made day care services available to all members of the class.

In light of the above statutory and regulatory provisions it is evident that the plaintiffs have acquired a specific and legitimate expectation that they will be able to send their children to a day care center. As the Supreme Court said regarding the termination of Home Relief Benefits under Aid to Families with Dependent Children, "[s]uch benefits are a matter of statutory entitlement for persons qualified to receive them." *Goldberg v. Kelly,* 397 U.S. 254, 262, 90 S.Ct. 1011, 1017, 25 L.Ed.2d 287 (1970). Such an entitlement rises to the level of a property interest protected by the due process clause of the fourteenth amendment. In *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972), the Court stated that "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Based upon the applicable statutes and regulations it cannot be doubted that the plaintiffs have a property interest in continuing to receive the state-afforded benefit of being able to send their children to day care centers. *See Goss v. Lopez,* 419 U.S. 565, 572–74, 95 S.Ct. 729, 42 L.Ed.2d 725 (1974).

The issue in the instant case, however, is whether the impact of the decision to close the selected day care centers upon those parents presently utilizing them adjudicates important rights to which those parents have an entitlement. While it is settled that minimal procedural due process is not required "in every conceivable case of government impairment of private interest," *Cafeteria Workers v. McElroy,* 367 U.S. 886, 894, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961), the Court has noted that it is the *nature* of the interest impaired rather than its weight which determines whether the due process clause is applicable. *Goss v. Lopez,* 419 U.S. at 575, 95 S.Ct. 729. "[A]s long as a property deprivation is not de minimis, its gravity is irrelevant to the question whether account must be taken of the Due Process Clause." *Id.* at 576, 95 S.Ct. at 737. By analogy to the ten-day suspension from school found not to be de minimis in *Goss,* the Court concludes that depriving a parent of a previously afforded opportunity to utilize a nearby day care center whose staff is familiar with the needs of the child is, similarly, not de minimis and may not be done without regard for the strictures of due process. Although a parent may not have an entitlement to send a child to a particular center, having once begun at a particular center there is a reasonable expectation that the child will be permitted to continue to attend there. *Compare N.A.A.C.P. v. United States Postal Services,* 398 F.Supp. 562 (N.D.Ga.1975) (users of post office have no entitlement regarding the continued location of a branch nearby). This problem is especially acute in that the children involved are quite young and readjustment may be difficult. More severe detriments are suffered in situations where children have special emotional or physical problems with which their particular center has been dealing (*see, e. g.,* the affidavits of Marie Myrtil and Jane Roe). Although the record does not speak to the point, the Court concludes from a reading of the relevant regulations as well as the papers filed in this case, that it is unusual for a child to be shifted from one center to another in the absence of some

special circumstance, such as a move by his parents. 18 N.Y.C.R.R. § 459.6(a)(1) provides that no child should be accepted for care unless the director of the center "has determined that admission meets the needs and interests of the child and his family and of the group to which the child will be assigned. . . ." Section 459.10(c) requires the center to obtain relevant information regarding the child's background, capabilities and limitations "to assist in the introduction and participation of such child in the program of the day care center." Finally, § 459.15 requires each center to develop "a program for meeting the individual and group needs of the children therein. . . ." Taken together, these regulations indicate that continuity is not only the norm of the system, it is the implied mandate of the regulations. Thus, this situation is surely different from that existing in the Massachusetts prison system where transfer from one prison to the other occurs not infrequently and for numerous reasons or no reason. As a result, the Supreme Court's conclusion that a prisoner's "expectation . . . in remaining at a particular prison so long as he behaves himself, . . . is too ephemeral and insubstantial to trigger procedural due process protections . . . ." *Meachum v. Fano,* —— U.S. ——, 96 S.Ct. 2532, 49 L.Ed.2d ——, 44 U.S.L.W. 5053, 5057 (1976), does not apply to the parents in the instant case.

This conclusion is in accord with that reached by Judge Ward in *Gasaway v. McMurray,* 356 F.Supp. 1194, 1197 (S.D.N.Y.1973), where it was held that the claim of a right to a hearing prior to the closing of a day care center and relocation at an already overburdened center raised a not insubstantial constitutional question. Further support is found in two decisions by the Second Circuit Court of Appeals. In *Burr v. New Rochelle Municipal Housing Authority,* 479 F.2d 1165 (2d Cir. 1973), the court held that tenants in municipal housing had a property interest in rent levels and imposition of service charges sufficient to trigger a right to some due process prior to any changes in either. More recently in *Caramico v. Secretary of H.U.D.,* 509 F.2d 694 (2d Cir. 1974),

the court considered the nature of the property interest belonging to non-owner occupants of two-to-four family dwellings with mortgages insured by the Federal Housing Administration ("FHA"). In *Caramico,* the landlords who owned the houses in which the plaintiffs lived had defaulted on their mortgage payments. The mortgagees, desiring to recover their mortgage insurance from FHA sought to evict the plaintiffs in order to comply with an FHA rule that required the mortgagee of a defaulted property to deliver that property unoccupied before he could recover on the insurance. HUD was authorized to waive the no-occupant requirement and a HUD handbook mentioned certain factors which might be considered in permitting a waiver. In light of these factors, the court found a protectable property interest, stating:

It is true that plaintiffs here do not have a conventional property interest. They have no privity of contract because their leases are no longer in effect and their status as occupiers has been foreclosed by the state court proceedings. Nevertheless, it is now abundantly clear that there are other protectable interests besides the traditional ones. [Citations omitted.] When, as in this case, plaintiffs have resided in their apartments for a substantial period of time, they have some interest in continued occupancy, at least when that occupancy is not flatly prohibited by regulation.

.   .   .   .   .

Since plaintiffs have a protectable interest in continued occupancy, and are beneficiaries of the very Act under which their eviction is demanded, we agree with Judge Dooling that they have a right not to be subjected to treatment both "covert and arbitrary," and must be allowed to have an input into the decision to require eviction.

*Id.* at 700–01 (footnotes omitted). Finally, relying upon *Burr* and *Caramico,* Judge Zampano has held that tenants in housing have a "protected interest at stake in [a] policy change" which terminated the housing authority's "no eviction" policy and re-

placed it with a policy requiring payment of rent in arrears. *Owens v. Housing Authority,* 394 F.Supp. 1267, 1272 (D.Conn.1975). Thus, on the instant factual record and in the context of massive defundings, this Court (on the authority of the above discussed cases) declines to follow the decision in *Windham v. City of New York,* 405 F.Supp. 872 (S.D.N.Y.1976).

Having determined that the plaintiffs have an entitlement to the use of a day care center as accessible as the one in which their children are presently enrolled and to which these young children have become acclimated, the questions becomes, what process is due?

The defendants contend that the decision to close the subject day care centers is one of policy reached after a consideration of legislative facts and that there are no facts bearing on this question which a hearing would bring to light. This reasoning fails to recognize that the due process clause also applies to administrative policy decisions when those decisions are premised upon adjudicative facts. Although the distinction between adjudicative and legislative facts is easier to state than to apply, as Professor Davis explains, adjudicative facts are "facts about the parties and their activities, business and properties," while legislative facts are "general facts which help the tribunal decide questions of law and policy and discretion." K. Davis, *Administrative Law Treatise* § 7.02, at 413 (1958). In discussing this distinction, Judge Friendly stated,

> [n]ormally, when a civilian executive or administrative agency is about to take action adverse to a citizen, on the basis of "adjudicative facts," due process entitles the citizen at some stage to have notice, to be informed of the facts on which the agency relies, and to have an opportunity to rebut them . . . .

*Langevin v. Chenango Court, Inc.,* 447 F.2d 296, 300 (2d Cir. 1971). In the instant case the facts upon which ACD made its defunding decision and the facts which the plaintiffs seek to present are facts relating to the business, activity and property of the day care centers scheduled to be closed. The facts upon which the ACD relied in making its decision regarding which centers to close are facts which are both adjudicative and within the knowledge of the plaintiffs. As the Tamke affidavit details, in addition to fiscal criteria, the ACD considered "facility quality," "availability of alternatives" and "program quality." Affidavit, at 4. These are all adjudicative type facts about which plaintiffs are peculiarly situated to comment and about which they should be given an opportunity to comment. As the Court said in *Caramico,* 509 F.2d at 701,

> This input can be of value to the federal defendants as well as to the plaintiffs. For example, plaintiffs may be able to show that the housing they occupy is fit for continued habitation and that the repairs required in order to make it salable do not require the property to be vacated. Or they may be able to show to the satisfaction of the federal defendants that the threat of vandalism if the apartments are vacated is high and that continued occupancy is necessary for preservation of the property.
>
> It is essential to the protection of plaintiffs' rights that they be allowed to participate because neither the FHA nor the mortgagees seem to be able to represent the interests of occupants. The mortgagees are often far removed from the actual property and therefore have no information that could aid the FHA in determining whether vacant delivery is necessary. The FHA has already proved itself incapable of adequately investigating each request. Only plaintiffs, and others in their position, have both the motive and information to insure that a reasoned decision, taking their interest into account, will be made.

Based on the above, the court held that the tenants should be afforded notice, an explanation of the grounds for the decision and an opportunity to submit evidence and argument regarding the decision to be made. Similarly, in *Burr v. New Rochelle Municipal Housing Authority,* 479 F.2d 1165 (2d Cir. 1973), the court held that, before a

municipal housing authority could impose across-the-board rent increases, all tenants had to be afforded notice of the proposed increase and an opportunity "to submit any material they consider relevant to disprove the need for the rent increase." *Id.* at 1170.

In the instant case the Court finds that the parents have information and ideas which should be considered by ACD before it makes a decision and that due process requires that the plaintiffs be afforded some kind of input (*cf.* Friendly, *Some Kind of Hearing,* 123 U.Pa.L.Rev. 1267 (1975)) before a final decision is made.*

In conclusion, the Court finds that the plaintiffs have demonstrated a substantial likelihood that they will succeed on the merits. As to the balance of hardships, although the Court does not minimize the nature and extent of the fiscal crisis facing the defendants, it does not justify taking action in violation of the due process clause. The relief granted to the plaintiffs in this case will not put an undue financial burden upon the defendants. It will, of course, require them to keep funding the centers until a hearing is held and the information gathered there is evaluated. How long this takes is a function of how quickly the defendants act. The entire process can easily be concluded within one month and, in all likelihood, will require two to three weeks. Balanced against the expenditure which such continued funding will require is the right of the plaintiffs to have an input into this decision before they feel its impact. A final consideration is the fact that numerous members of the plaintiff class have been demanding a hearing over the last few weeks and the defendants could have utilized their own regulations (18 N.Y.C.R.R. § 358.6) to hold a group hearing similar to what the Court is now ordering. Having chosen to proceed without providing such a hearing, the Court finds the balance of the equities to be in favor of the plaintiffs.

It is therefore ordered that ACD hold a group hearing or a series of group hearings as soon as is practicable. The purpose of this hearing or group of hearings is to afford the parents an opportunity to present their views and information to ACD. The Court will not order ACD to present any evidence or produce its officials for questioning. Its decision, and the basis therefore, is amply laid out in the papers submitted to this Court.

The parties are directed to submit proposed orders by July 1, 1976 at 12:00 noon.

The foregoing constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

The Court declines to issue a stay pending appeal.

SO ORDERED.

---

* The defendants have referred the Court to the recent decision of *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18, 44 U.S. L.W. 4224 (1976), apparently contending that due process does not require the hearing to be held before the centers are defunded. This, of course, is not the import of *Mathews.* As Justice Powell there stated, the "Court consistently has held that some form of hearing is required before an individual is *finally* deprived of a property interest." *Id.* at 4228 (emphasis supplied). Here, unlike the situation in *Mathews,* there is no opportunity for an administrative review of ACD's decision. It is a final decision. As a result, due process requires that the hearing be afforded before the defunding rather than after, when it would be no more than a sham.