**PEOPLE'S COUNSEL OF the DISTRICT OF COLUMBIA,**
Petitioner,

v.

**PUBLIC SERVICE COMMISSION OF the DISTRICT OF COLUMBIA,**
Respondent.

**Potomac Electric Power Company,**
Intervenor.

**No. 81–1309.**

District of Columbia Court of Appeals.

Argued Nov. 5, 1982.
Decided March 28, 1984.

---

Jay D. Pedelty for petitioner. Brian Lederer, Elizabeth A. Noel, John T. Schell, Michael W. Beasley and Roderic L. Woodson also entered appearances for petitioner.

Michael E. Geltner for respondent. Lloyd N. Moore, Jr., Michael deHaven Newsom and Warner Lawson, Jr. also entered appearances for respondent.

**1.** *See* FERC Opinion No. 97, Docket No. EL 80–22.

Allen C. Barringer for intervenor. Edward A. Caine and Betty K. Cauley also entered appearances for intervenor.

Before NEBEKER, FERREN and PRYOR, Associate Judges.

NEBEKER, Associate Judge:

The Office of People's Counsel ("OPC") filed this petition of appeal to challenge the lawfulness of several actions of the District of Columbia Public Service Commission ("Commission"). These actions related to a settlement agreement between General Public Utilities ("GPU") and the Pennsylvania-New Jersey-Maryland Interconnection ("PJM") which was designed to alleviate problems caused by the prolonged power outages of GPU's Three Mile Island Units 1 and 2. The Potomac Electric Power Company is a member utility of PJM.

Pursuant to the settlement agreement, which was approved by the Federal Energy Regulatory Commission ("FERC"),[1] PJM members sell electricity to GPU member utilities at a rate equal to the seller's marginal cost of production plus ten (10) percent of the difference between that cost and the purchaser's decremental cost of production. Under this settlement agreement, a utility selling to GPU companies will apparently realize less revenue than under the previous pricing arrangement. Pepco ratepayers would therefore be met with more expensive utility bills.

Choosing not to pursue reconsideration of FERC's action or review thereof (*see* 16 U.S.C. § 825 (1976)),[2] the OPC instead filed a Motion for Declaratory Ruling before the Commission seeking to protect D.C. ratepayers from the assertedly adverse impact of the settlement agreement. The ruling sought a declaration, in effect, that Pepco's ratepayers would be shielded from the utility cost increases engendered by the settlement agreement. The Commission denied

**2.** We are unable to determine why the OPC did not pursue review of FERC's approval of the settlement agreement.

the OPC's motion.[3] From this ruling the OPC has taken its appeal.

Pepco was allowed to intervene and successfully moved to dismiss this appeal, urging that the relief requested by the OPC was preempted by federal law. *See Narragansett Electric Co. v. Burke*, 381 A.2d 1358 (R.I.1977), *cert. denied*, 435 U.S. 972, 98 S.Ct. 1614, 56 L.Ed.2d 63 (1978). *See also Washington Gas Light Co. v. Public Service Comm'n*, 452 A.2d 375, 385 n. 15 (D.C.1982). On April 21, 1982, we granted the motion on that ground. *People's Counsel v. Public Service Comm'n*, 444 A.2d 975 (D.C.1982). On July 22, 1982, after receiving petitions for rehearing and rehearing en banc from the Commission and People's Counsel, we vacated our previous order. The case was reargued before the division on November 5, 1982. On November 12, 1982, we asked all parties to address four questions in a Supplemental Memorandum. The questions were:

(1) Given the Supreme Court of Rhode Island's opinion in *Narragansett Electric Co. v. Burke*, 381 A.2d 1358 (R.I. 1977), *cert. denied*, 435 U.S. 972, 98 S.Ct. 1614, 56 L.Ed.2d 63 (1978), and footnote 15 of this Court's opinion in *Washington Gas Light Co. v. Public Service Commission*, 452 A.2d 375, 385 (D.C.1982), does FERC's approval of the settlement in its docket number EL 80–22 (FERC Opin. No. 97, 10/1/80) preclude the Public Service Commission, as a matter of federal preemption, from ordering allocation of the impact of the settlement in whole or in part to the Pepco shareholders in this or any other proceeding, and require the ratepayers to bear the entire brunt of the settlement?

(2) Does the following clause in the settlement affect the answer to question (1)?:

The Settlement Agreement ... shall be deemed withdrawn, null, void, and without any effect whatsoever in the event any regulatory commission having jurisdiction over the rates charged to customers of any party hereto formally proposes to negate or modify the means by which interchange results are reflected in rates and/or proposes to adjust the cost of service for rate-making purposes, as a direct or indirect result of this Settlement Agreement, in any manner objectionable to the affected party hereto. [Agreement of Settlement and Compromise, p. 5.]

(3) If allocation of the impact of the aforesaid settlement to the Pepco shareholders is not precluded as a matter of federal preemption, does the record show (in light of People's Counsel's request or otherwise), strictly as a matter of law—without regard to Public Service Commission expertise and discretion—whether such allocation is precluded as a matter of general ratemaking principles in this or another proceeding?

(4) *Are issues (1), (2), and (3) presently before this Court?* (Emphasis added.)

Now, after review of the Supplemental Memoranda filed by all parties, and upon reconsideration of the record, we are persuaded that the substantive issues are not before us and that we must dismiss the petition of appeal.

 The Commission argues that no appeal may lie from the instant denial of declaratory relief. We agree. This matter involves a purported appeal from a denial of a motion for a declaratory order, and D.C.Code § 1–1508 (1981) states quite explicitly that "[t]he refusal of the mayor or of an agency to issue a declaratory order shall *not* be subject to review." (Emphasis added.) In the order on appeal, the Commission ruled, "that the People's Counsel's motion for declaratory ruling be, and the same is hereby denied." *See* Formal Case No. 733 (Order No. 7364, July 10, 1981), p. 7. Ordinarily, this would be sufficient response to petitioner's and intervenor's arguments that we are empowered to reach the merits. *Cf. Sonderling Broadcasting*

---

**3.** *See* Formal Case No. 733 (Order No. 7364, July 10, 1981), p. 7.

Corp. v. District of Columbia Minimum Wage and Industrial Safety Board, 315 A.2d 828, 829 (D.C.1974). However, two contentions must be briefly addressed.

■ First, petitioner derives several assertedly substantive rulings from the Commission's order. These are offered as independent grounds for judicial review. We are not persuaded. This argument only obfuscates the central issue which is whether we have statutory authority to review the pertinent agency action. That the Commission provided a detailed explanation for its ruling does not allow for our review. It is within the sound discretion of the Commission to issue a declaratory order upon an applicant's proposal. *Cf. Yale Broadcasting Co. v. F.C.C.*, 155 U.S.App. D.C. 390, 398, 478 F.2d 594, 602 (1973). The Commission is not, however, required to make one. *See* D.C.Code § 1–1508 (1981) ("the mayor or any agency ... *may* issue a declaratory order ...." (emphasis added)). *See also* 5 U.S.C. § 554(e) (1976).

■ Second, it has been urged that the Commission's refusal to issue a declaratory order is reviewable independent of § 1–1508, because of D.C.Code § 43–905(a) (1981) ("The District of Columbia Court of Appeals shall have jurisdiction to hear and determine any appeal from an order or decision of the Commission."). We disagree. In *Chesapeake & Potomac Telephone Co. v. P.S.C.*, 339 A.2d 710 (D.C. 1975), we held that the District of Columbia Administrative Procedure Act ("DCAPA") was applicable to the Commission "except in the area of appellate procedure and scope of review." *Id.* at 712. Reviewability, which is at issue here, concerns the availability of review and not its scope or the procedure by which it is secured. Section 1–1508 is therefore controlling in this case. The petition of appeal is

*Dismissed.*

FERREN, Associate Judge, concurring:

In its motion to dismiss this appeal, the Public Service Commission relies on the District of Columbia Administrative Procedure Act (DCAPA), D.C.Code § 1–1508 (1981), which removes jurisdiction from this court to review an agency's "refusal ... to issue a declaratory order." Despite the fact that § 1–1508 reflects a significant curtailment of this court's power to review certain forms of agency decisionmaking, we have never addressed several important questions inherent in applying that provision of the DCAPA. The case on which this division principally relies, *Sonderling Broadcasting Corp. v. District of Columbia Minimum Wage and Industrial Safety Board*, 315 A.2d 828, 829 (D.C.1974), provides no such analysis. Accordingly, although I agree with the majority's conclusion that § 1–1508 precludes review in this case, I write separately to address these important questions, for the answers are necessary to deal fully and fairly with the arguments of petitioner, the Office of People's Counsel (OPC).

The issues concerning the reviewability of agency decisions are complex and have received a great deal of attention in the federal courts, where we must look for guidance. In order to place my reading of DCAPA § 1–1508 in context, Part I summarizes the law with respect to reviewability, including the effect given statutory provisions that expressly preclude judicial review. Part II discusses the policies underlying § 1–1508's preclusion provision and defines the types of agency action to which that provision applies. Part III discusses the particular facts and arguments presented in this appeal.

I. REVIEWABILITY OF AGENCY ACTION

The doctrine of reviewability deals with the threshold question whether the legislature intended to permit judicial review of a particular form of administrative action. This inquiry must be distinguished from related doctrines that restrict the availability of review because of the timing of an appeal (exhaustion of administrative remedies, primary jurisdiction), the nature of the agency action or the alleged injury

(finality, ripeness, mootness), or the inappropriateness of the parties before the court (standing, sovereign immunity). Reviewability also must be distinguished from the analysis governing a court's standard and scope of review of an agency's action—an analysis that becomes relevant only after it is determined that the legislature has authorized some level of reviewability. In addressing the Commission's motion to dismiss on reviewability grounds, therefore, it is necessary to focus solely on whether Congress intended to permit this court to entertain petitioner's challenges to Commission Order No. 7364.

D.C.Code § 43–905(a) (1981) confers on this court "jurisdiction to hear and determine any appeal from an order or decision of the Commission."[1] I read the broad language of this section to create a strong presumption that this court's jurisdiction may be invoked to review any action taken by the Commission. This presumption of reviewability may be overcome only upon a showing of clear and convincing evidence of a legislative intent to preclude judicial review. *See generally Abbott Laboratories v. Gardner,* 387 U.S. 136, 140–41, 87 S.Ct. 1507, 1510–11, 18 L.Ed.2d 681 (1967) (reading federal Administrative Procedure Act (APA), as well as pre-APA case law, to establish a "basic presumption of judicial review"); L. JAFFE, JUDICIAL CONTROL OF ADMINISTRATIVE ACTION 336–59 (1965).[2] Thus, the question before the court, as I see it, is whether DCAPA § 1–1508 pro-

---

**1.** D.C.Code § 43–905 (1981) is the exclusive statutory grant of jurisdiction to review decisions of the Commission. *Chesapeake & Potomac Telephone Co. v. Public Service Comm'n,* 339 A.2d 710, 712–13 n. 9 (D.C.1975). Unlike most District of Columbia agency orders, the orders and decisions of the Commission are not made reviewable by DCAPA § 1–1510, D.C.Code § 1–1510 (1981). *Id.; see* D.C.Code § 11–722 (1981). Contrary to an argument advanced by the Potomac Electric Power Company (PEPCO), however, the decision in *Chesapeake & Potomac Telephone, supra,* in no way affects the application of DCAPA § 1–1508 to this case.

As the opinion in *Chesapeake & Potomac Telephone* points out, the original version of DCAPA § 1–1510 "gave this court review jurisdiction over orders and decision of all District agencies except five enumerated agencies." 339 A.2d at 712 n. 9. The Commission was one of the five excluded agencies. D.C.Code § 1–1510 (1967 & Supp. III 1970). The District of Columbia Court Reform and Criminal Procedure Act of 1970 eliminated these five exclusions and completed the process of consolidating authority to review the orders and decisions of District agencies in this court. Pub.L. No. 91–358, §§ 111, 162, 84 Stat. 473 (1970); D.C.Code § 11–722 (1973). Although the Court Reform Act brought the other four previously excluded agencies within this court's review jurisdiction by amending DCAPA § 1–1510 and invoking the DCAPA's review provisions, review of the Commission's orders was transferred to this court pursuant to the Commission's organic act, D.C.Code Title 43, chapters 1–10.

*Chesapeake & Potomac Telephone* recognized that Congress chose to transfer jurisdiction in this manner because it wanted to exempt the Commission from the standard and scope of review provisions contained in DCAPA § 1–1510. 339 A.2d at 713. Consequently, while DCAPA § 1–1510 provides this court with an affirmative authorization to review the decisions of most District agencies, the affirmative authority to review orders and decisions of the Commission—including the standard and scope of review to be used—is established solely by that agency's organic act, D.C.Code Title 43. *See* D.C.Code §§ 43–905, –906 (1981). *Chesapeake & Potomac Telephone* went on, however, to hold that "except in the area of appellate procedure and scope of review [*i.e.,* DCAPA § 1–1510], the drafters of the [DC]APA intended the Act to apply to the Commission." 339 A.2d at 712–13 (footnote omitted). Thus, the fact that this court's affirmative authorization to review Commission orders and decisions comes from D.C.Code Title 43, rather than from DCAPA § 1–1510, does not permit this court to ignore the restrictions placed on its review jurisdiction by DCAPA § 1–1508.

**2.** The strong presumption favoring judicial review of agency action reflects a recognition that review is essential to promoting agency responsiveness to legislative mandates. *E.g., Ralpho v. Bell,* 186 U.S.App.D.C. 368, 378, 569 F.2d 607, 617 (1977) ("unreviewability gives the executive a standing invitation to disregard ... statutory requirements and to exceed the powers conferred' ") (quoting B. Schwartz, *Administrative Law,* § 147 at 439 (1976)). In construing a presumption of reviewability from the language of D.C.Code § 43–905 (1981), I merely recognize that the need for judicial oversight to ensure administrative responsibility is as strong at the local level as it is with respect to federal agencies. *See* F. COOPER, STATE ADMINISTRATIVE LAW 31–32, 42–44, 81–82, 676–77 (1965).

vides the required evidence of legislative intent to overcome the presumption of reviewability and thus to bar judicial review of OPC's challenges to Commission Order No. 7364.

There are two principal methods by which a legislature can signal its intent to negate judicial review of an agency action: (1) by committing such action entirely to agency discretion; and (2) by precluding review, either expressly or implicitly, by statute. *See* 5 U.S.C. § 701(a). Although DCAPA § 1-1508 clearly falls in the second category, it is critical to an understanding of this case to review the manner in which courts have dealt with the first, as well as the second, method of restricting review; for the case law applicable to the first method provides significant policy reasons that also are applicable when courts confront statutory provisions expressly precluding review. *See* Part II *infra*.

A. *Review Precluded: Committed to Agency Discretion and "No Law to Apply"*

When a statute expressly entrusts a decision to an agency's discretion, it implicitly withholds some measure of the reviewing court's authority to set aside that agency decision. Put another way, to the extent that a decision is committed to an agency's discretion, the reviewing court cannot replace the agency's judgment with its own. The reviewing court, on the other hand, is frequently charged by a separate statute to ensure that an agency does not abuse its discretion by acting in an arbitrary or capricious manner. *E.g.,* 5 U.S.C. § 706(2)(A); D.C.Code § 1-1510(a)(3)(A) (1981); D.C.Code § 43-906 (1981). Thus, when a statute entrusts a decision to agency discretion, there is usually a need to reconcile that statute with the reviewing court's statutory mandate to scrutinize ex-

ercises of agency discretion. *See Littell v. Morton,* 445 F.2d 1207, 1210-11 (4th Cir. 1971). The court accordingly must evaluate the extent to which the legislature's directive of judicial deference to agency expertise supersedes its directive that the judicial branch protect society from abuse of administrative discretion.

In *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971), the Supreme Court announced the general proposition that there are very few matters so wholly committed to agency discretion that judicial review is precluded. The Court concluded that, in light of the strong presumption of reviewability, judicial review should be withheld completely only "in those rare instances 'where [an agency's organic] statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Id.* (quoting S.Rep. No. 752, 79th Cong., 1st Sess. 26 (1945)). Alternatively stated, whenever the legislature provides standards to guide agency discretion—and against which an agency's decisions or decision-making process can be measured—the courts are to presume that the legislature intended to permit judicial review in order to ensure compliance with such standards.

The "no law to apply" test, however, has been sharply criticized for providing little or no useful guidance for distinguishing between reviewable and unreviewable exercises of agency discretion. K. DAVIS, ADMINISTRATIVE LAW TREATISE § 28.16 (Supp. 1982). Because of this shortcoming, "courts have supplemented the test with a more pragmatic analysis of the effects of judicial review on the agency, the plaintiffs and the courts." *American Friends Service Committee v. Webster,* 231 U.S.App. D.C. ——, ——, 720 F.2d 29, 40 n. 10 (1983).[3] More specifically, this pragmatic

---

**3.** A number of the other federal circuit courts of appeal have also adopted such a pragmatic approach to determining the reviewability of discretionary administrative action. *American Federation of Government Employees, Local 2017 v. Brown,* 680 F.2d 722, 725-26 (11th Cir.

1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 728, 74 L.Ed.2d 952 (1983); *Bullard v. Webster,* 623 F.2d 1042, 1046 (5th Cir.1980), *cert. denied,* 451 U.S. 907, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981); *Local 2855 American Federation of Government Employees v. United States,* 602 F.2d 574, 578-80

approach to determining the reviewability of actions "committed to agency discretion" has been refined in recent decisions dealing with the reviewability of an agency's decision not to promulgate a new rule. *E.g., National Resources Defense Council, Inc. v. SEC,* 196 U.S.App.D.C. 124, 606 F.2d 1031 (1979) (leading case) [hereinafter cited as NRDC].

In NRDC, the court identified "three particularly important factors" that should guide a court in balancing an agency's need for flexibility in policy and decision-making against society's need to have such exercises of discretion controlled: (1) "the need for judicial supervision to safeguard the interests of the plaintiffs"; (2) "the impact of review on the effectiveness of the agency in carrying out its congressionally assigned role"; and (3) "the appropriateness of the issues raised for judicial review." *Id.* at 137, 606 F.2d at 1044 (citation omitted). After considering these three factors, a court should "inquire whether the considerations in favor of nonreviewability thus identified are sufficiently compelling to rebut the strong presumption of judicial review." *Id.*[4]

The policies implicated by applying the three NRDC factors to an appeal challenging the substance of an agency's decision not to promulgate a rule are instructive to the case now before this court. The first NRDC factor the need to safeguard plaintiff's interests—will "rarely present unusual or compelling circumstances calling for judicial review" of a decision not to adopt a rule. *Id.* at 138, 606 F.2d at 1045. Because such a decision does not "alter the *status quo ante,*" it will seldom inflict any specific detriment on the plaintiff or infringe on any statutory or constitutional right. *Id.*[5]

Consideration of the second factor—the impact of review on the effectiveness of

(3d Cir.1979); *Langevin v. Chenango Court, Inc.,* 447 F.2d 296, 302–03 (2d Cir.1971). Moreover, the Supreme Court itself has relied, at least in part, on the "practical effects of reviewability" in deciding that an action was so entirely committed to agency discretion as to be unreviewable. *Southern Railway Co. v. Seaboard Allied Milling Corp.,* 442 U.S. 444, 457, 99 S.Ct. 2388, 2395, 60 L.Ed.2d 1017 (1979). *See also* Saferstein, *Nonreviewability: A Functional Analysis of "Committed to Agency Discretion,"* 82 HARV.L.REV. 367 (1968).

**4.** Before applying these three factors, the court in *NRDC* distinguished between the types of challenges presented by the petitioner. The court viewed the challenges as falling into two categories: first, allegations that the SEC failed to comply with certain statutorily mandated procedures; and, second, claims that the agency's substantive judgment not to issue the particular rules requested was arbitrary and capricious. *Id.* 196 U.S.App.D.C. at 137, 606 F.2d at 1044. Although the court was able to conclude with "little difficulty" that the procedural challenges were a proper subject for judicial review, it found the substantive challenges to require a "quite different" and much more involved reviewability analysis. *Id.*

By making this distinction between the reviewability of different types of challenges to an agency action, the *NRDC* opinion implicitly recognized an aspect of reviewability analysis that is seldom discussed by courts and commentators. Discussions of reviewability generally assume "that all administrative action is either reviewable or not reviewable;" *i.e.,* "that any particular case is either within or without the area of review." 4 K. DAVIS, ADMINISTRATIVE LAW TREATISE § 28.02, at 5–6 (1958). A careful examination of the case law, however, reveals that certain agency actions have been held reviewable with respect to some types of challenges but unreviewable with respect to others. *Id.* at §§ 28.01, 28.02, 28.08. This is merely to say that in some cases Congress has been understood to preclude judicial review of certain challenges to a particular agency action while permitting review of other challenges to that same action. In this respect, the reviewability doctrine merges with the doctrine of scope of review. *Id. See generally Johnson v. Robison,* 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974); *Oestereich v. Selective Service System Local Bd. No. 11,* 393 U.S. 233, 89 S.Ct. 414, 21 L.Ed.2d 402 (1968); discussed *infra* at 1282–1283.

**5.** *NRDC* points out that the mere fact an agency has not changed the *status quo* does not, in itself, preclude judicial review. *Id.* 196 U.S.App.D.C. at 138 n. 16, 606 F.2d at 1045 n. 16 (citing *Rochester Telephone Corp. v. United States,* 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147 (1939) (rejecting the "negative order doctrine")). What the opinion does suggest, however, is that there is generally less need for judicial review to protect the interests of a plaintiff when the agency action at issue serves to continue, rather than alter, existing standards.

the agency—can provide support both for nonreviewability and for reviewability. On the one hand:

> Requiring an agency to defend in court its decision not to adopt proposed rules will divert scarce institutional resources into an area that the agency in its expert judgment has already determined is not even worth the effort already expended. The danger of throwing good money after bad, moreover, also exists in a more subtle form because the very prospect of litigation may cause the agency to give a proposal more elaborate consideration than it might actually merit.

*Id.* Thus, an inherent drawback to permitting judicial review of an agency decision not to act upon a request is that the agency will be forced to expend resources building a record and developing arguments that will withstand judicial scrutiny.[6]

On the other hand, judicial review could improve the decision-making process by encouraging agencies to give serious consideration and reasoned response to citizen petitions. "Judicial review of agency decisions not to adopt rules would help ensure that the agency gives due consideration to citizen participation, and in this sense might actually enhance the agency's effectiveness in furthering the public interest." *Id.* at 139, 606 F.2d at 1046 (footnote omitted); *see generally* Stewart, *The Reformation of American Administrative Law*, 88 HARV.L.REV. 1669, 1781–89 (1975).

Finally, the third factor—appropriateness of the issues raised for judicial review—typically presents "the strongest argument against reviewability" of an agency's refusal to adopt a rule. NRDC, *supra* at 139, 606 F.2d at 1046. This type of agency decision "is inevitably based, in large measure, on factors not inherently susceptible to judicial resolution—*e.g.,* internal management considerations as to budget and personnel; evaluations of [agency] competence; weighing of competing policies within a broad statutory framework." *Id.* Moreover an agency "may determine for reasons lying within its special expertise that the time for action has not yet arrived." *Id.*[7]

Having conducted this pragmatic calculus, the court in *NRDC* concluded that it is not possible to formulate a *per se* rule regarding the reviewability of discretionary agency decisions not to adopt rules. Courts must evaluate the pragmatic effects of reviewing such a decision on a case-by-case basis. Even in cases where "the relevant factors incline against reviewability," the "strong presumption of reviewability" will generally not be rebutted—and thus review will be proper—in cases where "the agency has in fact held a rulemaking proceeding and compiled a record narrowly focused on the particular rules suggested but not adopted." *Id.* at 140, 606 F.2d at 1047 (footnote omitted). The *NRDC* decision, therefore, has been interpreted to create the following test: "the greater the agency's investment of resources in considering the issues raised by [a rulemaking] petition, and the more complete the record compiled during the course of the agency's consideration, 'the more likely it is that the ultimate decision not to take action will be a proper subject for judicial review.' " *WWHT, Inc. v. FCC,* 211 U.S.App. D.C. 218, 227–28, 656 F.2d 807, 816–17

---

6. *See Southern Railway Co. v. Seaboard Allied Milling Corp.,* 442 U.S. 444, 457, 99 S.Ct. 2388, 2395, 60 L.Ed.2d 1017 (1979) (An ICC "no investigation" decision is not subject to judicial review, in part because such review would lead to "disruptive practical consequences." "If the Commission ... must carefully analyze and explain its action ... [and] increase the number of investigations it conducts, all in order to avoid judicial review and reversal, its workload would increase tremendously.")

7. *See Kixmiller v. SEC,* 160 U.S.App.D.C. 375, 379, 492 F.2d 641, 645 (1974) (per curiam) ("even the boldest advocates of judicial review recognize that the agencies' internal management decisions and allocations of priorities are not a proper subject of inquiry by the courts") (quoting *Medical Committee for Human Rights v. SEC,* 139 U.S.App.D.C. 226, 241, 432 F.2d 659, 674 (1970), *vacated as moot,* 404 U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972)).

(1981) (quoting *NRDC, supra* 196 U.S.App. D.C. at 140, 606 F.2d at 1047).[8]

### B. *Review Precluded by Statute*

A second, and more direct, method by which the legislature may foreclose judicial scrutiny of agency action is to preclude review by statute. Where legislation embodies a "clear command" restricting access to judicial review, the general presumption of reviewability is overcome and the courts' authority to entertain challenges to administrative action is withdrawn. *Barlow v. Collins*, 397 U.S. 159, 167, 90 S.Ct. 832, 838, 25 L.Ed.2d 192 (1970); *Briscoe v. Bell*, 432 U.S. 404, 413, 97 S.Ct. 2428, 2433, 53 L.Ed.2d 439 (1977). Although most courts have been reluctant to construe such a "clear command" from statutory provisions that are silent [9] or ambiguous [10] with respect to review, they have been less hesitant to give effect to statutory language—such as that in DCA-PA § 1–1508—that expressly bars review. *See, e.g., Briscoe, supra*, 432 U.S. at 412–14, 97 S.Ct. at 2432–34. In light of Congress' well-recognized authority to restrict or altogether eliminate judicial review of administrative action, subject only to constitutional restraints, *Switchmen's Union v. National Mediation Board*, 320 U.S. 297, 301, 64 S.Ct. 95, 97, 88 L.Ed. 61 (1943), a statute which on its face purports to foreclose judicial review should generally be read to accomplish just that. *Briscoe, supra*, 432 U.S. at 412–14, 97 S.Ct. at 2432–34; *Wilmington United Neighborhoods v. United States*, 615 F.2d 112, 118 (3d Cir. 1980).

As with any statutory provision, however, even an unambiguously worded preclusion provision must be interpreted with reference to statutory history and purpose. *Heikkila v. Barber*, 345 U.S. 229, 233, 73 S.Ct. 603, 605, 97 L.Ed. 972 (1953); *Ralpho v. Bell*, 186 U.S.App.D.C. 368, 378, 569 F.2d 607, 617 (1977). Indeed, recourse to statutory history and other aids to statutory construction has frequently led courts to imply certain limited exceptions to seemingly absolute preclusion provisions. *See id.;* 4 K. Davis, ADMINISTRATIVE LAW TREATISE § 28.02 (1958); F. Cooper, STATE ADMINISTRATIVE LAW 677–79 (1965). These exceptions reflect a legislative intent to permit review of specific types of challenges to agency action, despite an express bar to reviewability.

For example, courts consistently have read preclusion provisions implicitly to per-

---

**8.** *Compare WWHT, Inc., supra*, 211 U.S.App.D.C. at 228, 656 F.2d at 817 (limited substantive review permitted where agency, "after some preliminary consideration of the proposed rule," denies a petition for rulemaking) *with Center for Auto Safety v. National Highway Traffic Safety Admin.*, 228 U.S.App.D.C. 331, 341–43, 710 F.2d 842, 852–54 (1983) (per curiam) (McKinnon, J., concurring) (no review of agency decision to withdraw advance notice of proposed rulemaking where "decision was not focused" on any particular rule).

**9.** Despite support to the contrary in dicta from two Supreme Court cases, *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 156, 90 S.Ct. 827, 831, 25 L.Ed.2d 184 (1970); *Abbott Laboratories, supra*, 387 U.S. at 140 n. 2, 87 S.Ct. at 1511 n. 2 (both opinions quoting APA legislative history, H.R.Rep. No. 1980, 79th Cong., 2d Sess. 41 (1946), for the proposition that a statute may preclude review only where preclusion is expressed "upon its face"), it is now well established that the "clear and convincing evidence" required to rebut the presumption in favor of review may be derived from sources other than statutory text. *Southern Railway Co., supra* n. 3, 442 U.S. 444, 457, 99 S.Ct. 2388, 2395; *Morris v. Gressette*, 432 U.S. 491, 517, 97 S.Ct. 2411, 2426, 53 L.Ed.2d 506 (1977); Note, *Statutory Preclusion of Judicial Review Under the APA*, 1976 DUKE L.J. 431, 437–42. Courts have, nonetheless, remained reluctant to infer a bar to review in the absence of some support in the language of the statute. *Dunlop v. Bachowski*, 421 U.S. 560, 567, 95 S.Ct. 1851, 1857, 44 L.Ed.2d 377 (1975); *Environmental Defense Fund, Inc. v. Harden*, 138 U.S.App. D.C. 391, 396, 428 F.2d 1093, 1098 (1970) ("[p]reclusion of judicial review is not lightly to be inferred").

**10.** *E.g., Shaughnessy v. Pedreiro*, 349 U.S. 48, 51, 75 S.Ct. 591, 593, 99 L.Ed. 868 (1955) (although statute expressly makes a deportation decision by the Secretary of Labor "final," court "construe[s] the ambiguous word 'final' … as referring to finality in administrative procedure rather than as cutting off the right of judicial review in whole or in part").

mit judicial review of constitutional challenges. *E.g., Johnson v. Robison,* 415 U.S. 361, 366–74, 94 S.Ct. 1160, 1165–69, 39 L.Ed.2d 389 (1974); *Carter v. Cleland,* 207 U.S.App.D.C. 6, 8–10, 643 F.2d 1, 3–5 (1980).[11] Thus, even when a statute provides that an agency's decision "shall be final and conclusive and no other official or any court of the United States shall have power or jurisdiction to review any such decision," 38 U.S.C. § 211(a) (1976), courts have entertained constitutional challenges both to the statute underlying the agency decision, *Johnson, supra,* and to the administrative decision-making process itself. *Carter, supra.* Only when a statute expressly attempts to remove jurisdiction over constitutional challenges will a congressional attempt to cut off such claims be honored. *See id.* at 9–10, 643 F.2d at 4–5.

A second area in which courts often have refused to find a legislative intent to preclude review, despite an express statutory preclusion provision, is where the challenged agency action is a "clear departure" from an unambiguous statutory mandate. *E.g., Oestereich v. Selective Service System Local Board,* 393 U.S. 233, 238, 89 S.Ct. 414, 416, 21 L.Ed.2d 402 (1968); *Manges v. Camp,* 474 F.2d 97, 99–100 (5th Cir.1973); *see Ralpho v. Bell,* 186 U.S.App. D.C. 368, 383–86, 569 F.2d 607, 622–25 (1977). In *Oestereich, supra,* for instance, a Selective Service Board reclassified a divinity student and ordered him to report for induction in the face of a "plain and unequivocal" statute exempting divinity students from military training and service.

393 U.S. at 238, 89 S.Ct. at 416. The Military Selective Service Act of 1967 precluded pre-induction judicial review of such decisions as follows: "No judicial review shall be made of the classification or processing of any registrant ... except as a defense to a criminal prosecution." 50 U.S.C. app. § 460(b)(3) (1964 ed., Supp. IV). Despite this preclusion provision, the Court construed the Act to permit pre-induction judicial review of challenges, such as Oestereich's, which allege that the agency acted in a "blatantly lawless manner." 393 U.S. at 238, 89 S.Ct. at 416.

Courts have been cautious to limit this exception so as not to undermine the purpose of statutory provisions barring review. Where a preclusion provision is intended to give an agency unreviewable discretion regarding factual findings and the application of legal standards thereto, a complaint will be reviewable under this exception only insofar as it alleges that the agency's conduct is facially invalid, *i.e.,* the administrative action can be declared unlawful without questioning the agency's findings of fact or exercise of judgment.[12] Moreover, where the plain meaning, history, and purpose of an act demonstrate that Congress intended to prohibit all forms of judicial challenge, including claims that agency conduct is facially invalid, even this limited exception cannot authorize judicial review. *Briscoe, supra,* 432 U.S. at 412–13, 97 S.Ct. at 2432–34.

### C. Review Precluded: In Summary

Courts have analyzed the two types of statutory provisions that call reviewability

---

11. This approach allows courts to avoid the "serious questions" that otherwise would arise concerning the constitutionality of a statute that cut off an injured party's ability to seek judicial relief from unconstitutional agency action. *Johnson, supra,* 415 U.S. at 366, 94 S.Ct. at 1165; *see generally* Hart, *The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic,* 66 Harv.L.Rev. 1362 (1953).

12. *Compare Oestereich, supra,* and *Breen v. Selective Service Local Board,* 396 U.S. 460, 90 S.Ct. 661, 24 L.Ed.2d 653 (1970) (pre-induction review permitted where Selective Service Board ordered petitioner to report for induction de-

spite fact that he was admittedly entitled by law to a student deferment), *with Fein v. Selective Service System Local Board,* 405 U.S. 365, 373–75, 92 S.Ct. 1062, 1068–69, 31 L.Ed.2d 298 (1972) (distinguishing the "unusual circumstances" of *Oestereich, supra,* and holding that pre-induction review is foreclosed "where the board, authoritatively, has used its discretion arriving at a classification"), *and Clark v. Gabriel,* 393 U.S. 256, 258–59, 89 S.Ct. 424, 426, 21 L.Ed.2d 418 (1968) (no pre-induction review of Selective Service Board's decision because it "inescapably involves determination of fact and an exercise of judgment").

■■■■■■■■■■■

into question in quite different manners. Where a provision commits a decision to administrative discretion, judicial review is permitted in all but a very narrow range of cases. Only in those rare cases where there is "no law to apply"—*i.e.*, where a pragmatic analysis of the effects of review reveals that the legislature must have intended to delegate unreviewable discretion—will an agency action be found unreviewable. In contrast, once it is determined that an agency action falls within the scope of an express statutory preclusion provision, it is ordinarily not necessary for a court to evaluate the pragmatic effects of judicial review. It is generally understood that the legislature has weighed the benefits and detriments of permitting review and has made its intent clear in the plain meaning of the provision precluding review. Only with respect to a small number of narrowly-drawn exceptions, including constitutional challenges and claims of "clear departure" from an unambiguous statutory mandate, have courts been willing to deviate from the plain meaning of preclusion provisions and to read legislative intent to permit review.

II. DECLARATORY ORDERS AND REVIEWABILITY: DCAPA § 1–1508

OPC seeks to avoid dismissal of this appeal by arguing that Commission Order No. 7364 is not a "refusal ... to issue a declaratory order" within the meaning of DCAPA § 1–1508 and, consequently, is not sheltered from judicial review. OPC contends that Order No. 7364 goes beyond a mere denial of its request for a declaratory ruling; it includes "substantive rulings" that should be subject to judicial review. The Commission maintains, to the contrary, that the purpose of Order No. 7364 was simply to deny OPC's request for a ruling, and that the statements made in the order do no more than set forth the reasoning for its decision.[13]

Before addressing the specifics of this issue, it is necessary to consider the purposes underlying § 1–1508's preclusion provision in an effort to define more precisely the types of agency action that were intended to fall within the scope of the preclusion. While the legislative history of the DCAPA provides little insight here,[14] some guidance may be derived by contrasting the reviewability permitted under § 1–1508 with that provided under comparable sections of the federal APA and the original and revised Model State Administrative Procedure Acts (adopted by the National Conference of Commissioners on Uniform State Laws in 1946 and 1961 respectively). Comparisons with the federal APA and the two Model State Acts are particularly useful in light of the fact that the drafters of the DCAPA borrowed heavily from these three·sources. *See Citizens Association of Georgetown, Inc. v. District of Columbia Zoning Commission*, 402 A.2d 36, 45 (D.C. 1979). Further guidance may be culled from the sizeable amount of commentary that has been published on the proper use and the reviewability of administrative declaratory orders.[15]

13. The fact that Order No. 7364 purports to be merely a denial of a motion for declaratory ruling is not determinative of this issue. The descriptive terms an agency applies to its acts do not control a court's determination of the nature of those acts. *See* B. MEZINES, J. STEIN & J. GRUFF, ADMINISTRATIVE LAW § 43.01, at 43–9 (1983). Courts do, however, generally accord "a significant degree of credence" to an agency's characterization of its own actions. *See British Caledonian Airways, Ltd. v. Civil Aeronautics Board*, 190 U.S.App.D.C. 1, 11, 584 F.2d 982, 992 (1978).

14. The legislative history with respect to DCAPA § 1–1508 does little more than reaffirm the language of that section's reviewability provision:

"A refusal of the Commissioner, the Counsel, or an agency to issue [a declaratory] order would not be subject to review, but any such order issued would be subject to judicial review." S.Rep. No. 1581, 90th Cong., 2d Sess. 7 (1968); *see also* H.R.Rep. No. 202, 90th Cong., 1st Sess. 6 (1967).

15. *Report of the Subcommittee on Declaratory Orders of the Administrative Procedure Committee of the Administrative Law Section of the ABA*, 21 ADMIN.L.REV. 257 (1969); Hickey, *Declaratory Orders and the NLRB*, 45 NOTRE DAME LAW. 89 (1969); Reilly, *Declaratory Orders Under the APA—The Need for Legislation*, 52 IOWA L.REV. 657 (1967); F. COOPER, *supra* note 2, 240–44;

Except for its unique review provision, the text of DCAPA § 1–1508 is a composite of the federal APA and the two Model State Acts.[16] The first two sentences, which govern the issuance and the binding effect of declaratory orders, were modeled closely after the original Model State APA.[17] From the federal APA, the drafters of § 1–1508 borrowed language specifying the purposes for issuing declaratory orders—"to terminate a controversy ... or remove uncertainty"—as well as a clause emphasizing the discretionary nature of an agency's decision to issue such an order.[18] The final sentence of § 1–1508, directing agencies to prescribe rules to facilitate the processing of declaratory order petitions, appears to have been inspired by the revised Model State Act.[19]

With respect to its review provision, however, § 1–1508 breaks new ground. Although the first half of the review provision merely makes explicit what is implicit in the other acts—i.e., "[a] declaratory order is subject to review" [20]—the second half, precluding review of a "refusal ... to

Note, *Administrative Declaratory Orders*, 13 Stan.L.Rev. 307 (1961); W. Gellhorn & C. Byse, Cases on Administrative Law 699–708 (4th ed. 1960); 1 K. Davis, Administrative Law Treatise § 4.10 (1958); Mullen, *Should Broader Use Be Made of Declaratory Findings and Orders Under the APA*, 24 I.C.C.Prac.J. 156 (1956); Task Force on Legal Services and Procedure of the Hoover Commission on Organization of the Executive Branch of the Government, Report on Legal Services and Procedure 181–91 (1955) [hereinafter cited as Hoover Commission]; Goldner, *Declaratory Actions*, 2 Cath.U.L.Rev. 1 (1952); Blanchly & Oatman, *The Federal Administrative Procedure Act*, 34 Geo.L.J. 407, 417–21 (1946); Gellhorn, *Declaratory Rulings by Federal Agencies*, 221 Annals 153 (1942); Vogeler, *Declaratory Rulings in Administrative Agencies*, 31 Ky.L.J. 20 (1942); Attorney General's Committee on Administrative Procedure, *Administrative Procedure in Government Agencies*, S.Doc. No. 8, 77th Cong., 1st Sess. 30–33 (1941); Oliphant, *Declaratory Rulings*, 24 A.B.A.J. 7 (1938).

16. DCAPA § 1–1508 provides:

On petition of any interested person, the Mayor or an agency, within their discretion, may issue a declaratory order with respect to the applicability of any rule, regulation, Council act or resolution, or statute enforceable by them or by it, to terminate a controversy (other than a contested case) or to remove uncertainty. A declaratory order, as provided in this section, shall be binding between the Mayor or the agency, as the case may be, and the petitioner on the state of facts alleged and established, unless such order is altered or set aside by a court. A declaratory order is subject to review in the manner provided in this subchapter for the review of orders and decisions in contested cases, except that the refusal of the Mayor or of an agency to issue a declaratory order shall not be subject to review. The Mayor and each agency shall prescribe by rule the form for such petitions and the procedure for their submission, consideration, and disposition.

17. Model State Administrative Procedure Act § 7 (1946) reads:

On petition of any interested person, any agency may issue a declaratory ruling with respect to the applicability to any person, property, or state of facts of any rule or statute enforceable by it. A declaratory ruling, if issued after argument and stated to be binding, is binding between the agency and the petitioner on the state of facts alleged, unless it is altered or set aside by a court.

18. *See* 5 U.S.C. § 554(e):

The agency, with like effect as in the case of other orders, and in its sound discretion, may issue a declaratory order to terminate a controversy or remove uncertainty.

19. Revised Model State Administrative Procedure Act § 8 (1961) provides:

Each agency shall provide by rule for the filing and prompt dispositions of petitions for declaratory rulings as to the applicability of any statutory provision or of any rule or order of the agency. Rulings disposing of petitions have the same status as agency decisions or orders in contested cases.

DCAPA § 1–1508 also followed the lead of the Revised Model State Act by dropping the provision included in the original Model Act which made declaratory orders binding only "if issued after argument and stated to be binding." This change was intended to expand the usefulness of declaratory orders to petitioners. *See* F. Cooper, *supra* note 2, at 242.

20. The federal courts have consistently recognized the reviewability of administrative declaratory orders since 1939. 1 K. Davis, *supra* note 15, at § 21.07; *see Rochester Telephone Corp. v. United States*, 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147 (1939). Both the original and the revised Model State Acts have been read to authorize review of declaratory orders. F. Cooper, *supra* note 2, at 240–44.

issue a declaratory order," represents a significant departure from earlier APAs. The decision to give agencies unreviewable discretion to deny petitions for declaratory orders is particularly surprising when viewed in its historical context.

Before passage of the federal APA in 1946, there were repeated calls for the establishment of procedures to encourage the use of administrative declaratory orders as a valuable means of "letting the citizen know what government ... expects of him." Oliphant, *supra* note 15, at 7; Gellhorn, *supra* note 15; Voegeler, *supra* note 15; Attorney General's Committee on Administrative Procedure, *supra* note 15, at 30–33. Several of these commentators felt so strongly about the value of permitting citizens to solicit binding agency interpretations of statutes and rules that they advocated a procedure which would require agencies to issue a clarifying declaratory ruling whenever one was requested. *See* American Bar Association, Proposed Federal Administrative Procedure Act, 30 A.B. A.J. 226, 227 (1944); Attorney General's Committee on Administrative Procedure, *supra* note 15, at 234 (Report of Minority Members). Although these recommendations for a mandatory declaratory order rule received some attention in the legislative hearings leading to enactment of the federal APA, Reilly, *supra* note 15, at 663, they were ultimately rejected.

Instead, the drafters of the federal APA decided simply to authorize the issuance of declaratory orders and to leave to each agency's "sound discretion" the decision whether or not to respond to a petition. 5 U.S.C. § 554(e). A federal agency, therefore, may decline to issue a requested declaratory order—either after conducting investigation and proceedings on the matter or by dismissing the petition without discussion—but, the federal APA does not expressly shield such decisions from judicial review. This approach has been recognized as "[a] middle position between unreviewable discretion to decline to issue declaratory orders and compulsory jurisdiction to do so." 1 K. DAVIS, *supra* note 15, § 4.10 at 277. Such a "middle position" was also adopted by the drafters of the 1946 Model State APA. F. COOPER, *supra* note 2, at 241.

Under this "middle position" approach, the issue of reviewability must be addressed in accordance with the "committed to agency discretion" analysis discussed earlier, *supra* at 1279–1281. Thus, an agency's refusal to issue a declaratory order will be reviewable in most cases on an abuse of discretion basis. *Climax Molybdenum Co. v. Secretary of Labor*, 703 F.2d 447, 452 (10th Cir.1983); *Yale Broadcasting Co. v. FCC*, 155 U.S.App.D.C. 390, 398, 478 F.2d 594, 602, *cert. denied*, 414 U.S. 914, 94 S.Ct. 211, 38 L.Ed.2d 152 (1973); *see Human Rights Party v. Michigan Corrections Commission*, 76 Mich. App. 204, 210, 256 N.W.2d 439, 442 (1977).[21] Only in those rare cases where the negative effects of permitting judicial review are so strong that they outweigh the pre-

---

21. The right to judicial review of an agency's dismissal of a declaratory order petition filed pursuant to APA § 554(e) is supported by the legislative history of the federal APA: "... the phrase 'sound discretion' means a reviewable discretion and will prevent agencies from either giving improvident declaratory orders or arbitrarily withholding such orders in proper cases." ADMINISTRATIVE PROCEDURE ACT, LEGISLATIVE HISTORY, S.Doc. No. 248, 79th Cong., 2d Sess. 25 (1949).

The federal courts, however, have given different treatment to the dismissal of declaratory order petitions filed pursuant to Section 1.7(c) of the Federal Power Commission's Rules of Practice and Procedure. 18 C.F.R. § 1.7(c) (1982). Despite the fact that the language of § 1.7(c)—like that of APA § 554(e)—simply places the issuance of a declaratory order "in the discretion of the Commission," it has been read to confer upon the Commission "sole discretion" that may not be reviewed where the agency refuses to issue a declaratory order. *Tenneco v. FERC*, 688 F.2d 1018, 1023 (5th Cir. 1982); *Continental Oil Co. v. Federal Power Commission*, 285 F.2d 527 (5th Cir.1961) (per curiam); *United Gas Pipe Line Co. v. Federal Power Comm'n*, 203 F.2d 78, 79 (5th Cir.1953); *contrast Louisiana Public Service Comm'n v. Federal Power Comm'n*, 359 F.2d 525 (5th Cir.) (granting review of issuance of declaratory order pursuant to § 1.7(c)), *cert. denied*, 385 U.S. 833, 87 S.Ct. 73, 17 L.Ed.2d 68 (1966).

sumption in favor of review will the discretionary decision not to issue a declaratory order be deemed unreviewable. The question of reviewability ultimately will turn on whether the agency has invested enough resources and compiled a sufficiently complete record to permit meaningful review of its reasoning. *Supra* at 1281.

A decade after enactment of the federal APA, the Hoover Commission Task Force on Legal Services reported that very few federal agencies had developed procedures for the issuance of declaratory orders and that the use of administrative declaratory orders remained "negligible." HOOVER COMMISSION, *supra* note 15 at 188–89; *see Goldner, supra* note 15, at 10–15. The Task Force concluded that many agencies had seized upon the discretionary language of federal APA § 554(e) and refused to give serious consideration to petitions for declaratory orders. *Id.* Because of the failure of § 554(e) to promote the use of declaratory orders, the Task Force recommended that the federal APA be amended to make the issuance of such orders mandatory, at least where a justiciable controversy existed. *Id.* at 191. While proposals for statutory amendments of this type persisted during the 1960's, *see* S. 1336, 89th Cong., 2d Sess. § 6(k), 112 Cong.Rec. 13,-729, 13,732 (1966); *Report of Subcommittee on Declaratory Orders, supra* note 15; Reilly, *supra* note 15, federal APA § 554(e) has retained its "sound discretion" clause and its "middle position" approach to agency discretion.

The experience under state statutes patterned after the original Model State APA "was similar to that which obtained in the case of federal agencies." F. COOPER, *supra* note 2, at 242. Recognizing the reluctance of many state agencies to offer binding interpretations of legal standards, "the draftsmen of the Revised Model State Act sought to devise an amendment which hopefully would lead to the fuller realization of this beneficial procedure." *Id.*

After giving "[c]areful consideration" to a widely supported proposal that agencies be required to respond to every petition for a declaratory order with a ruling interpreting or clarifying the rule at issue, the drafters of the Revised Model Act concluded that such a procedure "went too far" in removing administrative flexibility and judgment. *Id.* at 242–43. The Revised Model Act did, however, move in the direction of a mandatory declaratory order rule by requiring agencies to respond to every declaratory order petition with a final and reviewable ruling—even if that ruling effectively declines to resolve the particular question presented by the petition. *Id.* 243–44. A decision not to address an issue must be supported by written reasoning and will be subject to review in the same manner as any other order. *Id.* In short, agency decisions refusing to issue declaratory orders are accorded "the same status as agency decisions or orders in contested cases." Revised Model State APA § 8, *supra* note 19. This requirement of a reasoned and fully reviewable response represents a compromise between the reviewable discretion provided by the Original Model Act and the unqualified compulsory jurisdiction advocated by many commentators in the 1950's and 1960's.

Drafting, consideration, and enactment of the DCAPA took place during the twelve-year period between 1956 and 1968. *Citizens Association of Georgetown, Inc., supra,* 402 A.2d at 45. Thus, the decision to provide in § 1–1508 for unreviewable discretion to dismiss declaratory order petitions was made in the face of growing support for greater restrictions on agency discretion in this area. The drafters of § 1–1508 not only refused to heed recommendations for a mandatory declaratory order rule, they also rejected the established "middle position" of reviewable discretion. They chose instead to preclude review altogether. This move reflects a clear legislative judgment that the negative effects of authorizing this court to review the deliberative process leading to an agency's dismissal of a declaratory order petition will consistently outweigh the benefits

of controlling agency discretion and ensuring serious consideration of such petitions.

In attempting to uncover the specific legislative purposes behind § 1-1508's unique provision, it is helpful to make use of the framework set forth in *NRDC, supra,* 196 U.S.App.D.C. at 137, 606 F.2d at 1044, *i.e.,* to examine the pragmatic effects of judicial review on the interests of persons seeking declaratory orders, on agencies, and on the courts.[22] Indeed, the policies that support a grant of unreviewable discretion to dismiss petitions for declaratory orders are the same as those that inclined against reviewability of a decision not to promulgate a rule in the *NRDC* context. An agency's decision whether or not to clarify an existing rule or statute by means of a declaratory order is similar in several important respects to a decision whether to promulgate a new rule.[23]

First, the simple dismissal of a petition for a declaratory order does not bind the agency or the parties to any particular interpretation of the law and in no way alters the *status quo ante.* Consequently, it will seldom inflict any specific detriment on the disappointed petitioner. Such a decision merely denies the petitioner an opportunity to obtain an interpretation of a statutory/administrative standard with respect to a particular set of facts. Any burden on the petitioner resulting from uncertainties inherent in the standard is left unchanged. Moreover, when an existing standard is so unclear as to provide petitioner with no useful guidance, or when its ambiguity effectively permits a third party to act in a manner which contravenes an independent legal norm, a judicial challenge to the existing standard is possible.

Second, the imposition of judicial review, and the consequent narrowing of an agency's discretion to withhold declaratory orders, could impair an agency's ability to function effectively. *See* 1 K. DAVIS, *supra* note 15, § 4.10 at 276; Note, *Administrative Declaratory Orders, supra,* note 15, at 319. Not only would an agency be required to expend resources defending its decision before a reviewing court, it also would be compelled to act upon each declaratory order petition in a manner calculated to withstand review, *i.e.,* to build an administrative record. When an agency has promulgated a rule and has built a record that supports the rule as written, it is undesirable to force the agency continually to develop support for its decisions not to clarify or modify the rule in a particular manner. Placing such a burden on agencies would greatly reduce the savings normally associated with the issuance of rules or policies intended to deal with problems in a general manner.

Finally, an administrative decision whether a declaratory order petition merits response presents issues that often are not well-suited for judicial resolution. Such a decision will frequently turn on whether the particular factual situation presented by the petition is sufficiently well-developed, important enough to warrant agency attention, and best dealt with by way of a declaratory ruling rather than case-by-case adjudication. *See* Reilly, *supra* note 15, at 663-64. Because a court generally will be ill-equipped to second guess agency judgment on matters of internal agency management, judicial review will be of little value in this area.

22. In *NRDC, supra,* this pragmatic analysis was used to discern the legislative purpose behind a statutory provision in an effort to determine whether that provision should be properly understood to provide an agency with unreviewable discretion. Here, it is clear the legislature intended to confer unreviewable discretion, but the *NRDC* analysis is nonetheless useful in understanding why the legislature chose to delegate such discretion and, consequently, what types of action were intended to be unreviewable.

23. *Cf. British Caledonian Airways, Ltd. v. Civil Aeronautics Board,* 190 U.S.App.D.C. 1, 8-13, 584 F.2d 982, 989-94 (1978) (noting similarities between agency decision to address a problem by way of an "interpretative" declaratory order and decision to promulgate a new "legislative" rule).

From this background, I draw two conclusions as to the proper scope of § 1–1508's preclusion provision. First, § 1–1508 precludes this court from reviewing an agency's refusal to issue a declaratory order without regard to the extent of the investigation undertaken or the record compiled in making this decision. Unlike the "middle position" approach to agency discretion adopted by the federal APA, DCA-PA § 1–1508 does not permit this court to examine orders dismissing petitions for declaratory rulings on a case-by-case basis to determine whether meaningful review would be feasible. The fact that an agency has chosen to provide the petitioner with extensive reasoning to support the dismissal of the petition, or to provide no reasoning at all, is not relevant to reviewability under § 1–1508.

This is not to say that any type of agency action during the course of denying a petition for a declaratory order is sheltered from review. The preclusion provision of § 1–1508 was not intended to immunize from review agency action that otherwise would be reviewable; the fact the action is announced in the context of dismissing a declaratory order petition is not automati-

cally dispositive. If, for example, in setting forth its reasons for not issuing a requested declaratory order, an agency issues an alternative—albeit unsolicited—declaratory order, review of that alternative declaratory order is appropriate. An agency's reasoning will not constitute an "alternative" declaratory order, however, unless it clarifies or adds to the existing understanding of a legislative or administrative standard in a manner that is binding on the agency and affects the rights or obligations of the parties involved.[24] Thus, an agency's refusal to issue a declaratory order will be reviewable when it effectively alters the *status quo* with respect to the agency's interpretation of a statute or rule; but when the agency merely sets forth its reasoning for rejecting a declaratory order petition and discloses the nature of its deliberative process, § 1–1508 precludes review.[25]

Second, the purposes underlying § 1–1508's preclusion provision do not suggest that the legislature intended to preclude this court from taking jurisdiction over claims that an agency acted unconstitutionally in withholding a declaratory order.[26]

**24.** These are the traditional prerequisites of a reviewable declaratory order. *See* D.C.Code § 1–1508 (1981); *Frozen Food Express v. United States*, 351 U.S. 40, 43–44, 76 S.Ct. 569, 100 L.Ed. 910 (1956).

**25.** By requiring some change in the *status quo* before an order dismissing a declaratory order petition may be judicially reviewed, I do not subscribe to the "negative order doctrine" rejected by the Supreme Court in *Rochester Telephone Corp. v. United States, supra* note 20. That judicially-created doctrine embodied an illusory distinction between orders that resulted in "action" and those that constituted "non-action." *Id.* 307 U.S. at 141, 59 S.Ct. at 762. When an order failed to alter the *status quo,* it was deemed to be "negative" and was unreviewable for lack of any affirmative agency action. *Id.* at 140 n. 24, 59 S.Ct. at 762 n. 24. My reading of § 1–1508 does not turn on any such metaphysical distinction between action and inaction. An agency decision not to issue a declaratory order involves no more and no less an exercise of agency discretion than does a decision to issue such an order. Moreover, both of these decisions result in action, one by changing the *status quo* and the other by reaffirming it. An

agency decision dismissing a declaratory order without altering the *status quo* is unreviewable in this jurisdiction not because it fails to rise to the level of administrative action, but rather because such an exercise of agency discretion is made unreviewable by § 1–1508.

**26.** Even if § 1–1508 were read to preclude this court from reviewing constitutional challenges, petitioner could still bring such challenges in federal court, as long as they were not "wholly insubstantial" or "obviously frivolous." *See Silverman v. Barry,* 727 F.2d 1121 at 1124 (D.C.Cir. 1984). The availability of this alternative forum reduces the constitutional barriers to reading § 1–1508 to preclude review of constitutional challenges. *See Weinberger v. Salfi,* 422 U.S. 749, 762, 95 S.Ct. 2457, 2465, 45 L.Ed.2d 522 (1975); *American Association of Councils of Medical Staffs of Private Hospitals, Inc. v. Califano,* 575 F.2d 1367, 1372–73 (5th Cir.1978), *cert. denied,* 439 U.S. 1114, 99 S.Ct. 1018, 59 L.Ed.2d 72 (1979). Nonetheless, I do not believe that § 1–1508's preclusion provision was intended to remove this court's supervisory responsibility over District agencies when constitutional violations are claimed.

Nor do they support a conclusion that § 1–1508 was intended to shield from review decisions made in direct contravention of a statutory mandate. *Contrast Briscoe, supra,* 432 U.S. at 410–13, 97 S.Ct. at 2431–33. Consequently, insofar as an appellant alleges that a dismissal of a declaratory order petition is unconstitutional or on its face contrary to an unambiguous legal requirement, the appeal falls outside the scope of § 1–1508's preclusion provision and this court may take jurisdiction.

III. REVIEWABILITY OF PUBLIC SERVICE COMMISSION ORDER NO. 7364

Commission Order No. 7364 dismisses OPC's declaratory order petition asking for an interpretation of the automatic fuel adjustment clause ("FAC") adopted by the Commission in Formal Case No. 651. *See* Commission Order No. 5849, 23 D.C.Reg. 4147, 4191 (1976); Proposed Opinion and Order No. 5831, at 30–34, 40–41 (1976). A summary of the factual background leading up to OPC's request for a declaratory order is helpful to understanding the reviewability issue here.

An automatic fuel adjustment clause is a rate mechanism that authorizes a utility to pass along to its customers increases or decreases in specified operating costs without first resorting to a formal evidentiary hearing, as is generally required before changes in the rate base used to recover utility costs.[27] This mechanism is used with respect to operating costs that fluctuate to such an extensive and unpredictable degree that a traditional test period ratemaking approach is an unsuitable means of cost recovery.

Under a test period approach, when a utility experiences an unforeseen rise or fall in its costs of operation, a substantial time will necessarily elapse between the date of such fluctuation and the date when the Commission enters an order adjusting the rates charged consumers. During this regulatory time lag, utility rates will not accurately reflect the costs of production and the authorized return on investment. Either the consumers will be paying too much and the utility will temporarily reap a higher-than-expected rate of return, or the rates will be too low and the utility will be unable to earn its authorized rate of return. Although such an imbalance can ultimately be redressed after a general rate hearing, the time lag may cause significant cash flow and credit rating difficulties for the utility or result in inequitable delays in rate reductions to consumers.[28]

In adopting an FAC in Formal Case No. 657, the Commission recognized that permitting an automatic pass through of fuel costs, without prior Commission supervision to ensure the reasonableness of such costs, would inevitably lead to a "potential lack of management incentive to minimize fuel costs." Proposed Opinion and Order No. 5831 at 31 (1976). The Commission nevertheless concluded that, in light of the erratic fluctuations in fuel costs, an FAC would "more accurately and more equitably reflect the significance of fuel costs" than would test period treatment of these costs. *Id.* at 30. The Commission also concluded that, because purchases and sales of electrical energy between PEPCO and PEPCO's fellow members in the Pennsylvania-New Jersey-Maryland Interconnection power pool (PJM) varied directly with the cost of fuel, the "net results" of interchange arrangements with PJM should also pass through the FAC. *Id.,* Order No. 5849, *supra,* 23 D.C.Reg. at 4191. Thus, during periods when PEPCO was a net supplier of electrical power to

27. *See* 16 U.S.C. § 2625(e)(3) (1982), defining the term for use in the Public Utilities Regulatory Policies Act of 1978, Pub.L. No. 95–617, 92 Stat. 3119 (1978). The District of Columbia Code does not define the term.

28. *See Peoples Counsel v. Public Service Commission,* 472 A.2d 860 at 863–865 (D.C.App.

1984); *see generally* Leaffer, *Automatic Fuel Adjustment Clauses: Time for a Hearing,* 30 CASE W.RES.L.REV. 228 (1980); Comment, *The Fuel Adjustment Clause and Its Role in Regulatory Process,* 47 MISS.L.J. 302, 306 (1976); Foy, *Cost Adjustment in Utility Rate Schedules,* 13 VAND.L. REV. 663 (1960).

PJM, the profits from these sales would be immediately passed through in the form of rate reductions to the District of Columbia ratepayers; in periods when PEPCO was a net buyer from PJM, PEPCO would immediately recover the actual cost of these purchases. The Commission compiled an extensive record in Formal Case No. 651 to support its decision to establish an FAC that included PJM interchange transactions.

At the time the FAC was adopted, the price of electricity bought from or sold to PJM group members was determined by a "split-savings" method. Under this method, electricity was priced midway between the incremental cost of production incurred by the selling utility and the alternative production cost avoided by the buyer. In other words, when a utility determined that it was cheaper to purchase electricity from another member of the PJM group than to produce more electricity itself, the buying and the selling utilities would evenly split the "savings" incurred by purchasing rather than generating additional power.

In March 1979, the sudden failure of a generating facility at Three Mile Island, Pennsylvania, resulted in a large loss of output capacity for a member of PJM, General Public Utilities Corporation (GPU). Because of this incident, the members of PJM agreed to amend their pooling agreement to provide GPU with electricity at prices lower than the "split savings" rate (incremental cost plus ten per cent). This PJM settlement agreement was approved by the Federal Energy Regulatory Commission (FERC) in an order issued in October 1980.

OPC filed its request for a declaratory order with the Commission in March 1980. OPC asked the Commission to interpret the FAC provision authorizing PEPCO to pass through to consumers the "net results" of PJM transactions, to require a pass through "calculated as if the 'split-savings' pricing formula were still applied to sales of interchange power." [29] In short, the price of electricity fell within the PJM pool and OPC asked the Commission to make PEPCO shareholders, rather than District of Columbia ratepayers, absorb the loss resulting from the fall in PEPCO's sale price. Implicit in OPC's request is an allegation that PEPCO acted unreasonably in agreeing to the PJM settlement agreement and that PEPCO should therefore bear any resulting loss.

After conducting an extensive investigation and holding a sunshine hearing—first in an effort to determine what position to take on the PJM settlement agreement during proceedings before FERC, and then in considering OPC's request—the Commission issued Order No. 7364 dismissing OPC's petition and setting forth its reasons for doing so.

A. *Order No. 7364 Is Not A Reviewable Declaratory Order*

OPC argues that Order No. 7364 should be treated as an unsolicited declaratory order reviewable by this court. OPC offers two grounds of support for this position.

First, OPC argues that Order No. 7364 contains "substantive rulings" and that this transforms it into a declaratory or-

---

**29.** Although none of the parties raised the question, it could be argued that interpretation of the FAC was not a proper subject for a declaratory order under § 1–1508. That section authorizes issuance of declaratory orders "with respect to the applicability of any rule, regulation, Council act or resolution, or statute...." It does not expressly authorize the use of declaratory orders to interpret prior agency orders, such as Order No. 5849, *supra*, establishing the FAC. *Contrast* revised Model State Administra-

tive Procedure Act § 8 (1961) (adding the word "orders" to the list of agency actions properly the subject of declaratory rulings); *see* F. COOPER, *supra* note 2, at 242. Nonetheless, I read § 1–1508 broadly to encourage the availability of declaratory rulings whenever they would be an efficient method of clarifying agency policy and would permit the issuance of declaratory orders with respect to all general rulings that have prospective application. The FAC at issue here is such a general prospective ruling.

der.[30] OPC misapprehends the distinction between a declaratory order and non-reviewable reasoning offered by an agency to support a refusal to issue a declaratory order. Every decision to dismiss a declaratory order petition will turn on substantive judgments made by the agency, unless the agency acts in a totally arbitrary fashion and without any consideration of the merits of the petition. The preclusion provision of § 1–1508 was intended to shield these substantive judgments from judicial review, in part because agencies should not be forced to detail and support these judgments with respect to every petition, and in part because such substantive judgments most often are within the special expertise of the agency and ill-suited to judicial review. *Supra* at 1288–1289.

The fact that an agency chooses to disclose its reasoning—its substantive judgments—rather than simply dismissing the petition without comment in no way affects reviewability. Only when the reasoning offered constitutes a binding agency statement that alters the *status quo* regarding the interpretation of a legislative/administrative standard will a reviewable declaratory order arise. Order No. 7364 did not alter the legal *status quo*. It did not rule on the reasonableness of PEPCO's assent to the PJM settlement agreement; nor did it approve the new rate at which PEPCO sold electricity to PJM. It merely stated that the Commission would not, at this time, add to or clarify the meaning of the FAC provision authorizing a pass through of the "net results" of interchange transactions. This court is precluded from reviewing the Commission's decision not to grant the declaratory order requested by OPC, and it is precluded from reviewing any substantive judgments expressed by the Commission in support of that decision.[31]

A second, and related, contention pressed by OPC is that Order No. 7364 should be found reviewable because it contains "conclusions of law or findings of fact" which this court could "review ... against established standards." Although it is true that

---

**30.** OPC has pointed to the following "substantive rulings" it claims are contained in Order No. 7364:

> that no official Commission decision was rendered at the "Sunshine Hearing" on June 17, 1980

> that the settlement agreement approved by FERC was substantially different from the agreement at issue in Formal Case No. 733

> that the position adopted by the Commission in Docket No. EL80–22 after the "Sunshine Hearing" is controlling in Formal Case No. 733

> that the Commission has no statutory authority to issue an order affecting PEPCO's rates based on the evidentiary hearing conducted in Formal Case No. 733

> that FERC conducted comprehensive evidentiary hearings before approving the PJM–GPU settlement agreement

> that the Commission's failure to use Formal Case No. 733 to formulate a position in Docket No. EL80–22, despite its express intention to do so, was not arbitrary, unreasonable, and unlawful.

**31.** Section 1–1508 was intended to protect both the ultimate agency decision not to issue a declaratory order and the deliberative process leading to such a decision. Consequently, this court is precluded not only from reviewing a dismissal of a declaratory order petition, but also from reviewing substantive decisions made during the course of an investigation leading to such a dismissal—unless the substantive decision results in a binding change in the legal *status quo* with effects beyond the dismissal of the petition.

This same basic result has been reached on slightly different grounds by federal courts dealing with the propriety of reviewing decisions made during the course of investigations that do not result in reviewable orders. Where an order is found not to be a proper subject for judicial review (usually on some basis other than an express preclusion provision), decisions made during the course of a preceding investigation are held to lack the finality necessary to warrant judicial review. *See International Telephone & Telegraph Corp. v. Local 134, International Brotherhood of Electrical Workers,* 419 U.S. 428, 442–44, 95 S.Ct. 600, 609–10, 42 L.Ed.2d 558 (1975); *Tenneco, Inc. v. FERC,* 688 F.2d 1018, 1021–22 (5th Cir.1982); *North Carolina Utilities v. FERC,* 209 U.S.App.D.C. 400, 413–14, 653 F.2d 655, 668–69 (1981). Although my analysis turns solely on a reading of § 1–1508, its effect on the judicial review of findings and conclusions made during the course of an investigation is very similar to that of the doctrine of administrative finality, with its emphasis on a requisite level of aggrievement.

these considerations weigh in favor of reviewability under the "middle position" approach to the review of declaratory orders adopted by the federal APA—embodying the "law to apply" standard for determining reviewability—they are irrelevant under § 1–1508's express preclusion provision. In § 1–1508, the legislature struck the policy balance between the need for administrative discretion and society's need to control that discretion. This court need not evaluate dismissals of declaratory order petitions on a case-by-case basis to determine whether there exists a record and applicable legal standards sufficient to make judicial review meaningful.[32]

### B. Challenges to Order No. 7364 as Unconstitutional or Facially Invalid

Having determined that Order No. 7364 does not go beyond a "refusal ... to issue a declaratory order," I need only determine whether any of OPC's challenges fall within one of the two exceptions to § 1–1508's preclusion provision, *supra* at 1289–1290. I conclude they do not.

Although OPC's Petition of Appeal to this court argues that the direct pass through of the new PJM prices violates the Commission's statutory mandate to regulate rates, as well as due process, this argument is not properly characterized as a challenge to Order No. 7364. Rather, it is an argument that the FAC, with its unsupervised pass through of costs to ratepayers, is statutorily and constitutionally defective. I express no opinion on this issue but note that the validity of the FAC must be determined by way of a direct challenge to that rate mechanism. If the FAC—in its present form, uninterpreted and unclarified by the Commission—violates some legal or constitutional standard, this must be determined by reviewing the operation of the FAC and the record developed to support its adoption, not by reviewing the Commission's decision refusing to issue a declaratory order. *See People's Counsel v. Public Service Commission,* 472 A.2d 860 (D.C.App.1984). Because OPC does not argue that the Commission violated the constitution or an unambiguous statutory mandate by deciding to refrain from ruling in this case, review is completely precluded and the Petition of Appeal is properly dismissed.

---

32. Although there is no need for this court to evaluate the policy implications of permitting judicial review here, the present case provides an excellent illustration of the policies that underlie § 1–1508's preclusion provision. In the absence of § 1–1508's preclusion provision, declaratory orders could be requested, and the Commission could be compelled to investigate, every change in the price PEPCO paid for fuel or received for interchange transactions. Each price change could bring a new declaratory order petition asking the Commission to determine whether the FAC should be read to permit the new price to be passed through to ratepayers. The Commission would be forced time and again to develop support for its decisions whether or not to pass a price change through the FAC. This would undermine the purpose of the FAC and unnecessarily burden the Commission and this court. While it is appropriate for the Commission to consider clarifications or modifications of the FAC in light of particular changes in the price of fuel or interchange transactions, sound policy supports § 1–1508's preclusion of review where the agency decides not to change established policy.